# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

№ 15-CV-2298 (JFB) (AYS)

————————————

DAYTREE AT CORTLAND SQUARE, INC., ET AL.,

Plaintiffs,

VERSUS

MICHAEL P. WALSH, ET AL.,

Defendants.

————————————

**MEMORANDUM AND ORDER**
August 15, 2018

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Thomas A. Datre Sr. ("Mr. Datre"), Clara Datre ("Mrs. Datre" and, together with Mr. Datre, the "Datres"), and Daytree at Cortland Square, Inc. ("Daytree" and, collectively, "plaintiffs") bring this action against defendants Michael P. Walsh, Edward Walsh,[1] Michael Torres, Robert L. Cicale, and Anthony S. Senft, Jr.; councilmembers of the Town of Islip (the "Town") Steven J. Flotteron, John C. Cochrane, Jr., and Trish Bergin Weichbrodt ("councilmember defendants") in their official capacities; and the Town (collectively, "defendants"). Plaintiffs bring their claims pursuant to 42 U.S.C. §§ 1983 and 1988, alleging violations of their Fourth, Eighth, and Fourteenth Amendment rights. Plaintiffs bring claims for declaratory and injunctive relief, as well as defamation

(libel), stigma-plus, breach of contract, and Section 1983 conspiracy.

In particular, plaintiffs allege that defendants conspired and carried out a plan to cause local authorities and the public to wrongly believe plaintiffs were responsible for dumping toxic materials in the Roberto Clemente Park (the "Park"), a public park in the Town. Plaintiffs allege that, as part of the conspiracy, defendant Michael Walsh used his position as Deputy Town Attorney to proclaim that the Town had completed an investigation and determined that plaintiff Daytree was responsible for the toxic dumping—a statement that defendants allegedly knew to be false. Specifically, plaintiffs assert that there was no investigation by the Town, nor was there a finding that Daytree was responsible. Additionally, plaintiffs claim that defendants shared this false information with the Suffolk

---

[1] On August 21, 2015, the complaint was dismissed by stipulation as against Edward Walsh. (ECF No. 25.)

Thus, references to "defendant Walsh" in this opinion are to Michael Walsh.

County District Attorney's Office ("DA's Office") and the media, leading to widespread dissemination via social media. Plaintiffs allege that defendants' defamatory statements were motivated by a desire to deflect blame for the environmental scandal onto plaintiffs for defendants' own political gain.

As a result of defendants' allegedly false statement that plaintiffs were responsible for the toxic dumping, plaintiffs claim that they have suffered extreme injuries, including Mr. Datre's removal from a paid position with the Town, the raid and seizure of plaintiffs' contracting business as a result of the DA's Office investigation, the filing of multiple civil lawsuits against plaintiffs by third parties, and plaintiffs' vilification in the community, which has prevented them from resuming business operations, among other harms. Plaintiffs allege loss of their personal and professional reputations in addition to business and monetary harms. Plaintiffs seek compensatory and punitive damages for the alleged violations of their civil rights, as well as a declaratory judgment that they are not a responsible party for any alleged dumping in the Park.

Presently before the Court is defendants' motion to dismiss the complaint.[2] For the reasons set forth below, the Court grants defendants' motion to dismiss the claim for declaratory relief, grants the motion to dismiss the claims against the individual councilmember defendants, and denies the motion to dismiss in all other respects. In particular, plaintiffs have alleged a plausible

claim for defamation (libel) and, although defendants argue that the statements are subject to the litigation privilege because they were made in a notice letter to insurance carriers, the issue of privilege cannot be decided on a motion to dismiss in this case (especially in light of the allegations of bad faith and malice). Plaintiffs have also sufficiently alleged a plausible stigma-plus claim under Section 1983 in alleging that these false and defamatory statements were made, *inter alia*, to terminate Daytree's tree-removal contract with the Town without any process. The Section 1983 conspiracy and municipal liability claims also contain sufficient allegations to survive a motion to dismiss. Similarly, plaintiffs have stated a plausible breach of contract claim under New York state law in connection with the Town's alleged failure to pay plaintiffs under the tree-removal contract. However, the declaratory judgment and injunctive relief claims fail as a matter of law in this particular case, and the claims against the individual councilmember defendants must be dismissed as duplicative of the municipal liability claim.

I. BACKGROUND

A. Factual Background

1. The Allegations of Toxic Dumping

The Court takes the following facts from plaintiffs' complaint and the exhibits attached thereto.[3]

Starting in or around August 2013, the Town's Parks Department supervised the creation of soccer fields inside the Park,

---

[2] Defendant Michael Torres is not represented by the attorneys that submitted the joint motion to dismiss, but the remaining defendants note in their papers that "Counsel for Mr. Torres has . . . indicated that he joins in and adopts the arguments set forth herein." (ECF No. 57.) The Court, therefore, accepts this motion to dismiss as filed on behalf of all remaining defendants, including Torres.

[3] As discussed *infra*, in considering a motion to dismiss, courts may consider documents attached to, integral to, or referred to in the complaint, as well as documents filed in other courts and other public records. *See, e.g.*, *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

which involved contractors delivering fill materials to the Park. (Compl. ¶¶ 102-03.) Defendant Senft, who served as the Town Board's liaison to the Parks Department (the "Parks Liaison") at the time, was among those individuals at the Parks Department supervising this project (the "Park project").[4] (Id. ¶ 103.) According to the complaint, in September 2013, one or more persons complained that materials were being transported into the Park without permits, and/or that "objectionable" materials had been dumped there. (Id. ¶ 110.) In particular, it is alleged that "tons" of "toxic materials" were illegally dumped at the Park.[5] (Id. ¶ 2.) As discussed further *infra*, plaintiffs allege that defendants wrongly blamed them for the dumping, and deny "hav[ing] ever 'dumped' so much as one grain of dirt . . . or anything else, whatsoever, in the park," or having "transported anything to the park . . . period." (Id. ¶¶ 30-31.)

### 2. The Political Backdrop

According to the complaint, defendants accused plaintiffs of the alleged toxic dumping as part of a politically motivated conspiracy. (Id. ¶¶ 232-72.) Plaintiffs explain that defendants, who were all members of the Conservative Party or held a position in the Town government,

"scapegoated" them for two reasons: (1) to deflect blame for the incident away from fellow Conservative Party members, and (2) to "destroy plaintiffs' reputation and thereby eviscerate the plaintiffs' well-established ability to raise campaign funds for political candidates who were not [members of the Conservative Party]." (Id. ¶¶ 240, 255, 258.)

Mr. Datre has served as the chairman of a local and national Political Action Committee ("PAC"), through which he has raised "hundreds of thousands of dollars in campaign moneys" for both Republican and Democratic candidates. (Id. ¶ 5.) According to the complaint, "much to the chagrin" of defendants, Mr. Datre has not raised funds for the Conservative Party or its candidates. (Id. ¶ 6.) At the time of the events at issue, defendants allegedly felt that Mr. Datre's fundraising activities had hurt the Suffolk County Conservative Party by limiting its leader's ability to influence the outcomes of elections. (Id. ¶¶ 6-8.)

Many of plaintiffs' allegations involve that leader, Eddie Walsh, who served as the Suffolk County Conservative Party's Chairman. (Id. ¶ 233.) Although Eddie Walsh was dismissed as a defendant from this case, the complaint alleges that the other

---

[4] Plaintiffs state that the two other members of the Parks Department team supervising the soccer field project are also defendants in this action (Compl. ¶ 103), but plaintiffs did not serve them and it does not otherwise appear they named them as defendants.

[5] The allegations regarding the alleged illegal dumping are the subject of a separate lawsuit. *See Town of Islip v. Datre*, 245 F. Supp. 3d 397 (E.D.N.Y. 2017). In *Town of Islip*, the Town brought suit against numerous defendants, including Daytree and Mr. and Mrs. Datre (plaintiffs in this action), alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(d), 1964(c), and the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and asserting multiple state law

claims. *Town of Islip*, 245 F. Supp. 3d at 403. The Town brought these claims based on the same underlying facts that gave rise to the instant action: the alleged illegal dumping of hazardous waste at the Park (although in *Town of Islip* the Town claimed that numerous parties in addition to plaintiffs here played a role). *Id.* In its Memorandum and Order granting multiple defendants' (including plaintiffs in this action) motions to dismiss, the Court discussed the Park, the alleged toxic waste dumping, and the DA's Office investigation into the dumping. *Id.* at 404-07. The Court also granted leave to re-plead, *id.* at 404, and denied subsequent motions to dismiss the amended complaint, Order, *Town of Islip v. Datre*, No. 16-CV-2156 (E.D.N.Y. Mar. 28, 2018), ECF No. 114.

defendants were his "political operatives" and participated in the alleged conspiracy in furtherance of his political objectives. (*See, e.g., id.* ¶¶ 6-8, 10, 15-22.) The remaining defendants in this case all held positions in the Conservative Party; some also held positions in the Town municipal government. These defendants include: Michael Walsh, member of the Conservative Chairman's Club (*id.* ¶ 236), member of the Town of Islip Conservative Executive Committee (*id.*), and Deputy Town Attorney (*id.* ¶ 70); Michael Torres, Town of Islip Conservative Party Chairman, serving directly under Eddie Walsh (*id.* ¶ 234); Robert Cicale, Town Attorney (*id.* ¶ 25); and Anthony Senft, Jr., Committeeman of the Town of Islip Conservative Party, serving directly under Eddie Walsh, and Parks Liaison (*id.* ¶¶ 74, 235). Plaintiffs also sued councilmembers Steven Flotteron, John Cochrane, Jr., and Trish Weichbrodt, but in their official capacities only. (*Id.* ¶¶ 78-82.)

Plaintiffs allege that Eddie Walsh had secured paid positions in the Town government for his political operatives, several of whom were responsible for overseeing the Park at the time of the alleged dumping. (*Id.* ¶ 9.) Two of Eddie Walsh's alleged operatives who are not defendants in this case served as the Parks Commissioner (the "Commissioner") and Secretary to the Parks Commissioner (the "Secretary"). (*Id.* ¶ 11.) According to the complaint, sometime prior to January 21, 2014, the Commissioner, Secretary, and defendant Senft (Parks Liaison) learned of the allegations that there had been unlawful dumping of potentially toxic materials "while the park was under their collective supervision." (*Id.* ¶ 12.) They allegedly consulted with Eddie Walsh and defendant Torres, "their Islip Conservative Party Superiors . . . who had secured . . . their positions within the Town." (*Id.* ¶ 15.) Plaintiffs claim that, at this point, Eddie Walsh and defendants Torres, Senft,

and Michael Walsh became concerned that the three Parks Department officials could be held responsible for the dumping, and thus "fabricated and proceeded to carry out a plan" to "deflect blame" away from them and onto plaintiffs. (*Id.* ¶¶ 15, 113.)

### 3. The Datres' Relationship with the Town and Individual Defendants

At the time of these events, plaintiffs Mr. and Mrs. Datre were the principals of plaintiff Daytree, a corporation "engaged in the business of building residential homes." (*Id.* ¶¶ 83, 85.) According to the complaint, Daytree "is not, and has never been, engaged in the business of material transport, or material disposal, except to the extent it removed trees, branches and greenery under a tree-removal contract it secured with the Town of Islip in 2012." (*Id.* ¶ 84.)

Plaintiffs allege that, as of January 2014, defendants "were affirmatively aware" that the Datres were the principals of Daytree (*id.* ¶ 104), and had contracted to perform tree removal services for the Town (*id.* ¶ 112), and that the Datres' son, Thomas Datre, Jr. ("Datre Jr."), owned a materials transport company that was "completely separate and independent from the company owned by his parents" (*id.* ¶¶ 105-06). Plaintiffs allege defendants were aware that Datre Jr.'s transport company was involved in the Park project, and had transported materials into the Park. (*Id.* ¶ 107.) Plaintiffs allege defendants were also aware that, unlike their son's company, *they* had not transported materials into the Park. (*Id.* ¶ 111.)

After receiving complaints about dumping in September 2013, the Commissioner and defendant Torres met with Datre Jr. to discuss these complaints. (*Id.* ¶¶ 110-11.) Plaintiffs assert that the Commissioner and Torres arranged this meeting because defendants knew of Datre

Jr. and his company's involvement in the Park project and in transporting materials into the Park.[6] (*Id.* ¶¶ 109-11.) Plaintiffs allege that, even though defendants were aware that Daytree was separate from Datre Jr.'s company, and had no involvement in bringing materials into the Park (*id.* ¶ 111), defendants devised a plan to "falsely project blame" onto plaintiffs (*id.* ¶ 114).

Plaintiffs allege that, in furtherance of this plan, Torres and another member of the Conservative Party appeared at Daytree's office and falsely accused plaintiffs of illegally dumping construction and/or other materials in the Park. (*Id.* ¶ 119.) The Datres informed them that neither they nor their company had dumped "anything, whatsoever" in the Park. (*Id.* ¶ 112.) Plaintiffs allege that, despite this conversation, Eddie Walsh and defendants Torres, Senft, and Cicale "then conspired to . . . have defendant Michael P. Walsh use his position as Deputy Town Attorney" to shift blame for the dumping to plaintiffs and falsely state that the Town had "completed" an investigation, through which it determined that plaintiffs were responsible. (*Id.* ¶ 121.)

According to the complaint, defendant Walsh[7] knew that the Town had not completed any such investigation, and had not determined that plaintiffs were responsible. (*Id.* ¶ 122.) Plaintiffs allege that, in response to a subpoena from the DA's Office, on April 21, 2014, defendant Walsh allegedly sent "a flurry of emails throughout the Town," directing Town employees and representatives to begin collecting records reflecting who was involved in the dumping. (*Id.* ¶¶ 130-31.) According to the complaint, the DA's Office investigation revealed that, from April 21, 2014 through the present, "not

a single employee of the Town sent <u>anything</u> to Michael Walsh which . . . indicated that [Daytree] was in any way, shape or form, involved in the alleged dumping." (*Id.* ¶ 132-33.) Plaintiffs further assert that the Town "is not in possession of a single document or record of any type" that suggests plaintiffs' involvement, "with one exception." (*Id.* ¶ 134.) That exception is a copy of handwritten notes from a Town government group meeting, which defendant Walsh attached to an email to the DA's Office Economic Crime Bureau Chief on April 23, 2014, and which includes the question "Where does Datre fall into this project?" (*Id.* ¶ 135; ECF No. 1-3 at 30, 33.)

#### 4. The Alleged Defamatory Statements

Plaintiffs allege that on April 24, 2014, defendant Walsh made the aforementioned defamatory statements about plaintiffs, which he knew to be false, and subsequently published these statements to third parties, including the press and the DA's Office. (*Id.* ¶¶ 123, 126, 130.) As discussed *supra*, the alleged false statements were that the Town had completed an investigation through which it had determined that Daytree was a "responsible party" for the toxic dumping. (*Id.* ¶ 124.) First, defendant Walsh sent five letters to insurance companies on April 24, 2014, each stating:

> Please be advised that our office received notice of dumping of construction material on town property located at [Roberto Clemente Park]. . . . Enclosed please find photos and field reports completed by town law enforcement person[nel] of the debris at the subject location. This letter shall serve to

---

[6] Plaintiffs emphasize that the Commissioner and Secretary attested in sworn statements to knowing of Datre Jr. and his company's involvement. (*Id.* ¶ 109.)

[7] As stated *supra*, any reference to "defendant Walsh" is to Michael Walsh, rather than Eddie Walsh (against whom the complaint was dismissed).

place your company on notice of the above listed loss.

We have completed our investigation and found that Daytree at Cortland Square is a responsible party.

(ECF No. 1-1 at 11-15.)[8] Plaintiffs allege that defendant Cicale, the Town Attorney, "had apparently consented" to defendant Walsh's publication of these statements. (Compl. ¶ 25.) According to the complaint, Cicale later told a News 12 reporter that "the letters and their content were: 'actually just a precautionary measure being taken to reserve the Town's right to take action later.'" (*Id.*) He allegedly further stated to this reporter that:

In this case, it's not that we made a final determination. We have insurance policies on file with the town of Islip for work done by this company, that may have also been done in the park, and if that's enough of a connection or a nexus for us, we're going to protect our interests.

(*Id.* ¶ 26.) Plaintiffs assert that Cicale was referencing the work they did under their tree-removal contract, "which was limited to the plaintiffs removing trees, tree trunks and branches at the request of the Town." (*Id.* ¶ 27.)

According to the complaint, defendants also informed the media and DA's Office that they had completed an investigation and found Daytree to be responsible. (*Id.* ¶ 32.) As a result, Newsday published the following articles: "Islip Town formally blames dumping on Daytree [at] Cortland Square," dated May 25, 2014, and "ISLIP PLACES BLAME: Tells insurers Daytree at Cortland Square at fault," dated May 26, 2014. (*Id.*

¶ 33; ECF No 1-1 at 17-20, 22-24.) According to the first Newsday article, "Walsh's letters to the insurance companies represent the first formal notification by Islip as to who town officials believe is responsible for the dumping." (ECF No 1-1 at 17.) Additionally, the story was published on television and the radio (*see* Compl. ¶ 34 (citing ECF No 1-1 at 51-52 (News 12 article, "Town of Islip blames [Daytree] in dumping scandal"), 54 (LI News Radio article discussing Daytree, "Islip blames contractor for toxic dumping"))), and was disseminated via social media (*see, e.g.,* Compl. ¶ 35 (citing ECF No 1-1 at 56, 58 (Facebook and Twitter messages sharing and responding to this story))).

5. The Alleged Harm to Plaintiffs

According to the complaint, Facebook users' responses to news stories about the toxic dumping, featuring Daytree, show the public outrage that led plaintiffs to feel defendants "vilified" them. For instance, one Facebook user wrote, "Du[m]ping toxic waste in [a] playground where children play? . . . Brentwood is a vulnerable, disadvantaged, segregated community. The racist implicati[o]ns are obvious. Real pigs." (ECF No 1-1 at 56.) Another portion of this message seems to incite violence against those responsible for the dumping. (*See id.*)

Plaintiffs allege that defendants further stigmatized them by terminating their two-year tree-removal contract with the Town shortly after sending the aforementioned letters to the insurance companies. (Compl. ¶¶ 36-37; ECF No. 1-2 at 2 (defendant Walsh's letter to Mrs. Datre terminating the contract).) Plaintiffs assert that this termination was "without cause, and without any form of hearing prior to such

---

[8] ECF No. 1-1 contains a compilation of exhibits attached to the complaint.

termination." (Compl. ¶ 37.) Plaintiffs allege that Eddie Walsh and defendants Senft, Cicale, and Michael Walsh "caused" the Town to terminate this contract and "contemporaneously publish to the press that the Town was 'severing all ties' with the plaintiffs." (*Id.* ¶¶ 36, 139.) The same defendants allegedly also caused the Town to terminate Mr. Datre from a paid position as the Town's Plumbers Examining Board Chairman, without cause or hearing, and again shared this information with the press. (*Id.* ¶¶ 38-39.) In both instances, plaintiffs allege that Eddie Walsh and these three defendants "exercised their influence and control over the Town and defendants Flotteron, Cochrane Jr. and Bergin-Weichbrodt" to bring about these contract terminations. (*Id.* ¶¶ 139-40.)

Finally, defendants allegedly accused plaintiffs of having committed "heinous criminal activity (*i.e., illegal dumping of toxic materials in a children's public park*)," as a result of which the DA's Office raided, seized, and "abruptly shut[] down" plaintiffs' business. (*Id.* ¶¶ 41-45.) Plaintiffs claim that the DA's Office seized all of their personal property and, to date, has not returned any of it. (*Id.* ¶ 46.)

According to the complaint, defendants' actions that publicly vilified plaintiffs were "equally fatal to the plaintiffs' business" as those of the DA's Office. (*Id.* ¶ 47.) Plaintiffs discuss the thousands of images of Mr. Datre "mailed directly to residents" in Suffolk County, thereby associating his picture with "the company that dumped 32,000 tons of toxic waste in our local parks." (*Id.* ¶ 48; ECF No. 1-2 at 10-11.) Plaintiffs claim that they cannot resume their normal business operations because they "are now shunned by the community, to the extent that no one with whom they formerly conducted business will speak to them." (Compl. ¶ 47.) As discussed *supra*, plaintiffs claim that they

have suffered a "loss of both their personal and professional reputations." (*Id.* ¶ 51.) They claim that they have suffered financial loss due to loss of their business, and became defendants in multiple civil lawsuits as a result of defendants' defamatory statements. (*Id.* ¶¶ 50, 53.)

B. Procedural Background

Plaintiffs commenced this action on April 22, 2015. Defendants filed a motion to dismiss on November 13, 2017. Plaintiffs filed their opposition to defendants' motion on January 11, 2018. Plaintiffs replied on February 2, 2018. The Court held oral argument on February 5, 2018, and reserved decision. The Court has fully considered the parties' submissions and arguments.

II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for courts deciding a motion to dismiss. 556 U.S. 662 (2009). The Supreme Court

instructed district courts to first "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly*, 550 U.S. at 556-57).

## III. DISCUSSION

Defendants move to dismiss, arguing that plaintiffs' claims surrounding their "political conspiracy theory" fail, and that the complaint amounts to a "wholly defective, state law claim for defamation." (Defs. Mem. at 3.) Specifically, defendants move to dismiss plaintiffs' complaint on the grounds that: (1) plaintiffs' claim for declaratory judgment and injunctive relief must be dismissed because these are remedies, rather than independent causes of action, (2) the "single statement at issue" is not defamatory as a matter of law, (3) plaintiffs fail to state a "stigma-plus" claim, (4) plaintiff Daytree's material breach of its contract with the Town precludes plaintiffs' breach of contract claim, and (5) plaintiffs fail to state a conspiracy claim under Section 1983. Defendants move

to dismiss with respect to (1) the Town under *Monell*, (2) the councilmember defendants, who were sued only in their official capacities, and (3) the remaining individual defendants based on qualified immunity.

As discussed *infra*, the Court concludes that the request for declaratory and injunctive relief must be dismissed, and the claims against the individual councilmember defendants in their official capacity are dismissed as duplicative of the municipal liability claim. The motion to dismiss is denied in all other respects as to the Town and remaining individual defendants.[9]

A. Claims for Declaratory and Injunctive Relief

1. Applicable Law

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "The decision to grant declaratory relief rests in the sound discretion of the district court." *Lijoi v. Cont'l Cas. Co.*, 414 F. Supp. 2d 228, 247 (E.D.N.Y. 2006) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289-90 (1995)). That discretion is informed by two primary considerations: (1) "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved," and (2) "whether a judgment would finalize the controversy and offer relief from uncertainty." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003)

---

[9] In the following sections, the Court discusses whether plaintiffs' claims are dismissed with respect to defendants generally. The Court notes that, as the complaint is dismissed with respect to the three councilmember defendants (Flotteron, Cochrane, and Weichbrodt), where it denies the motion to dismiss

specific claims, that denial is with respect to the four non-councilmember individual defendants (Walsh, Torres, Cicale, and Senft) and, for the Section 1983 claims, the Town.

(citing *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969)).

The party seeking a declaratory judgment bears the burden of demonstrating that the district court has jurisdiction—that is, that there is an "actual controversy," 28 U.S.C. § 2201(a), which is defined as one that is "real and substantial . . . admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts," *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001) (internal citation omitted); *see also Georgia-Pacific Consumer Prods., LP v. Int'l Paper Co.*, 566 F. Supp. 2d 246, 255 (S.D.N.Y. 2008). In a declaratory judgment action, "[t]he standard for ripeness . . . is that 'there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Md. Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Courts "cannot adjudicate conjectural or hypothetical cases or controversies. A controversy cannot be a mere possibility or probability that a person may be adversely affected in the future." *U.S. Underwriters Ins. Co. v. Kum Gang, Inc.*, 443 F. Supp. 2d 348, 352 (E.D.N.Y. 2006) (internal citations omitted).

"Whether a real and immediate controversy exists in a particular case is a matter of degree and must be determined on a case-by-case basis." *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991) (citation omitted). "Several courts have acknowledged the difficulty of line-drawing between those cases in which a controversy is of a hypothetical or speculative nature, and those that present issues of 'sufficient immediacy

and reality' to warrant declaratory relief." *M.V.B. Collision, Inc. v. Allstate Ins. Co.*, No. 07 Civ. 0187 (JFB) (JO), 2007 WL 2288046, at *7 (E.D.N.Y. Aug. 8, 2007) (quoting *Duane Reade, Inc.*, 411 F.3d at 388); *see also Reichhold Chems., Inc. v. Travelers Ins. Co.*, 544 F. Supp. 645, 650 (E.D. Mich. 1982) ("The difference between an abstract question and a controversy contemplated by the Declaratory Judgment Act is necessarily one of degree and, as such, it is extremely difficult to fashion a precise test for determining the existence, or non-existence, of an actual controversy in every fact situation.").

2. Analysis

Plaintiffs argue that they are entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that they are not a responsible party under CERCLA, pursuant to 42 U.S.C. § 9607, for any of the alleged dumping in the Park. Plaintiffs also seek "concomitant injunctive relief" barring defendants from continuing to disseminate allegedly false statements about plaintiffs' involvement. They bring this claim pursuant to 28 U.S.C. § 2202, which provides that a court may grant "[f]urther necessary or proper relief based on a declaratory judgment or decree." Plaintiffs argue that the Court should grant these requests because defendants' false statements have caused and continue to cause them irreparable harm. Further, plaintiffs argue that they have satisfied the requirement that an actual controversy exists, referencing the other ongoing litigation surrounding the alleged dumping. In support of their claim for injunctive relief, they also inform the Court that the Town has commenced a remediation project to remove the illegally dumped materials from the Park that threatens to destroy potential evidence of their innocence.

Defendants request that the Court dismiss these claims on the grounds that

(1) declaratory judgment and injunctive relief are remedies, rather than independent causes of action, and (2) plaintiffs have failed to establish that an actual controversy exists as required for the Court to award such relief. Defendants argue that plaintiffs "impermissibly seek[] an advisory opinion which is without a sufficient nexus to the independent claims asserted." (Defs. Reply at 3.) Defendants explain that the issues surrounding plaintiffs' responsibility for the dumping are "front and center in separate actions" that are currently pending in this court, including one before the undersigned. (*Id.* (citing *Town of Islip v. Datre*, No. 16-cv-2156 (E.D.N.Y filed Apr. 29, 2016), and *Seggos v. Datre*, No. 17-cv-2684 (E.D.N.Y. filed May 4, 2017) (New York State Attorney General and New York State Department of Environmental Conservation CERCLA action)).)

The Court agrees with defendants. As a threshold matter, it is well settled that a request for declaratory and/or injunctive relief is not an independent cause of action. *See KM Enterprises, Inc. v. McDonald*, No. 11-cv-5098 (ADS)(ETB), 2012 WL 4472010, at *19-20 (E.D.N.Y. Sept. 25, 2012) (collecting cases). In any event, there is no basis for declaratory or injunctive relief in this case.

With respect to declaratory relief, given that the pending actions defendants reference were brought "pursuant to the actual applicable law" to determine liability for dumping in the Park (Defs. Reply at 3; *see also* Pls. Mem. at 7 (discussing multiple CERCLA cases naming plaintiffs as defendants)), a declaratory judgment in this case runs the risk of amounting to an advisory opinion. *Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 241 (E.D.N.Y.), *on recons.*, 47 F. Supp. 3d 152 (E.D.N.Y. 2014) ("As with any federal action, courts may not entertain actions for declaratory judgment

'when the parties are asking for an advisory opinion' . . . ." (citing *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 403 (S.D.N.Y. 2012))). Even if the Court were to assume the "actual controversy" requirement has been satisfied here—which the Court could, in light of the ongoing litigation relating to the statements at issue—it is within the Court's discretion to decline to grant declaratory relief. *Lijoi*, 414 F. Supp. 2d at 247.

Plaintiffs argue that a declaratory judgment in this case would not lead to inconsistency with a subsequent decision in the *Town of Islip* case because this case was filed first, and would thus "have priority." (Pls. Mem. at 7 n.3.) However, the focus of this lawsuit is much narrower than the declaratory relief sought by plaintiffs. More specifically, plaintiffs allege here that the Town's statements were false because (1) no investigation had been completed *by the Town*, and (2) no determination had been made *by the Town* that plaintiffs were the responsible party for the alleged dumping. In other words, the claims hinge on the Town's conduct and knowledge, and the falsity of those statements by the Town could potentially be resolved without a determination as to the parties responsible for any alleged dumping. Therefore, plaintiffs seek declaratory relief regarding past conduct that is not an essential element of the claims brought here, and essentially seek an advisory opinion with respect to the subject matter of other pending lawsuits. In addition, a declaratory judgment that plaintiffs were not responsible parties likely would not settle the issues, *Dow Jones & Co.*, 346 F.3d at 359, and further, risks contradicting later decisions by this Court on these exact issues. The Court, therefore, grants defendants' motion to dismiss any claim for declaratory judgment.

Plaintiffs have also failed to articulate in the complaint any basis for injunctive relief in connection with the federal or state claims. It is well settled that "[t]he fact that the false statements may injure the plaintiff in his business or as to his property does not alone constitute a sufficient ground for issuance of an injunction. The party wronged has an adequate remedy at law." *Bynog v. SL Green Realty Corp.*, No. 05 Civ. 0305 WHP, 2005 WL 3497821, at *3 (S.D.N.Y. Dec. 22, 2005) (citations omitted). Because plaintiffs have failed to articulate any plausible basis for injunctive relief even if they prove their allegations, any claim for injunctive relief is dismissed.

B. Defamation Claim (Libel)

1. Applicable Law

In order to state a cause of action for libel under New York law, a plaintiff must plead: (1) a written false and defamatory statement of fact concerning the plaintiff; (2) that was published by the defendant to a third party; (3) due to the defendant's negligence or actual malice, depending on the status of the person libeled; and (4) special damages or *per se* actionability. *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 176 (2d Cir. 2000). In this case, defendants primarily argue that plaintiffs have inadequately pled the first element. As set forth below, the Court disagrees and concludes that plaintiffs have alleged a plausible defamation claim.

A statement that is an expression of opinion, not fact, cannot be the subject of an action for defamation. *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008) (citation omitted). Whether an individual statement is one of fact or opinion is a question of law, and New York courts consider the following factors:

(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being

proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . [to] readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Id.* (citations omitted).

Under New York law, "[g]enerally, a written statement may be defamatory 'if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community.'" *Golub v. Enquirer/Star Grp., Inc.*, 89 N.Y.2d 1074, 1076 (1997) (citation omitted). Courts may also find statements that "would cause apprehension about a person's ability to conduct business," or otherwise reflect on his or her performance of that business, to be defamatory. *Id.* The determination as to whether a statement qualifies as defamatory depends on the context, but "courts will not strain to find defamation where none exists." *Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999) (citations and internal quotation marks omitted).

To determine whether a statement is "of and concerning" the plaintiff, courts in this circuit look for a "reasonable connection between the plaintiff and the alleged libel." *Church of Scientology Int'l v. Time Warner*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992) (citation omitted). The test in this circuit is whether "the libel designates the plaintiff in such a way as to let those who knew [the plaintiff] understand that [s]he was the person meant. It is not necessary that all the world should understand the libel." *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 925 (2d Cir. 1987) (citation omitted). Although in general, an "an individual plaintiff must be clearly identifiable [in an

allegedly defamatory statement] to support a claim for defamation," New York courts have permitted exceptions. *Algarin v. Town of Wallkill*, 421 F.3d 137, 139 (2d Cir. 2005) (citation omitted).

Even where the pleading requirements for a defamation claim have been met, New York law affords qualified protection to statements that are "fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his [or her] own affairs, in a matter where his [or her] interest is concerned." *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 719 (2015). In *Front*, the court stated the "well-settled" rule that "statements made in the course of litigation are entitled to absolute privilege," *id.* at 718, and resolved the spilt among the New York Appellate Division Departments with regard to the level of privilege afforded to attorneys' statements made in connection with prospective litigation, *id.* at 719-20. The court held that a qualified privilege applies for pre-litigation statements, and "that the privilege is lost where a defendant proves that the statements were not pertinent to a good faith anticipated litigation." *Id.* at 720. For instance, the Second Circuit has stated that,

> A defendant forfeits this qualified privilege by making a false, defamatory statement with "malice" . . . . Common-law malice "mean[s] spite or ill will," and defeats the privilege only if it is "the one and only cause for the publication," . . . . Constitutional or "actual" malice means publication with "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not."

*Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001) (citations omitted).

### 2. Analysis

Plaintiffs bring their defamation claim based on allegations that defendants made multiple statements that the Town had completed an investigation and determined they were "a responsible party" for the illegal dumping in the Park. Plaintiffs allege that these statements include the letters to the insurance companies, as well as the subsequent statements to Newsday and the DA's Office. They argue that these statements "not only accuse the plaintiffs of committing serious criminal activity, but also tended to severely injure the plaintiffs in their trade, business and occupation" (Compl. ¶ 175), and were "defamatory and libelous *per se*" (*id.* ¶ 173). Plaintiffs discuss the reverberating effects of these statements in addition to the harms to their reputations, business, and livelihood, including "[g]awkers" visiting plaintiffs' offices "to sneer at the plaintiffs," hate messages on the company's answering machine, and the shunning and harassment plaintiffs' grandchildren endured at school, among others. (*Id.* ¶¶ 176-82.)

As a premise for their motion to dismiss this claim, defendants argue that plaintiffs challenge a single defamatory statement: the statement in defendant Walsh's letters to the insurance companies. Defendants request that the Court dismiss this claim on the grounds that (1) the statement at issue failed to meet the pleading requirements, in particular, because the statement was not of "fact," "defamatory," or directed at the Datres, and (2) regardless, the statement qualified as privileged. (Defs. Mem. at 9-14.)

Before turning to the pleading requirements, the Court rejects defendants' premise that plaintiffs' claim challenges a single statement (even if repeated in multiple letters to insurers). At this stage, plaintiffs have adequately alleged that the defamatory statements included multiple statements,

including those to the media and the DA's Office, in addition to the initial statements to the insurers. The news articles, other publications, and public social media response that plaintiffs supplied in their exhibits provide support for plaintiffs' plausible claim that defendants' statements went beyond defendant Walsh's initial communications.[10]

The Court has considered defendants' remaining arguments regarding the alleged defamatory statements and, for the reasons discussed below, denies their motion to dismiss this claim.

### i. Statement of Fact

First, the Court considers defendants' argument that the statement in the letters to the insurers does not qualify as a "false and defamatory statement of *fact*" because it "takes a legal position more akin to an opinion." (Defs. Mem. at 10.) The Court disagrees. Defendant Walsh's statement that the Town completed an investigation and found plaintiffs to be responsible satisfies each of the requirements in the New York standard for distinguishing fact from opinion: the statement has a "precise meaning," it is capable of being proven true or false, and the context of the insurance letter indicates that this was a factual statement. *Mann*, 10 N.Y.3d at 276. In other words, statements pertaining to whether there was an investigation by the Town or not, and whether there was a finding as to responsibility by the Town or not, are both clearly factual in nature, rather than opinion.

Although defendants point out that the Court must look at the context, an analysis of that context does not change the factual nature of the statements. As an example, context impacted this analysis in *Mann*, where the court determined that the at-issue statement was one of opinion based in part on the tone, and the fact that the statement appeared in the "opinion page" of a newspaper along with a note that the article expressed the author's opinion. *Id.* at 276-77. Here, by contrast, the alleged context does not transform the statements from fact to opinion. According to the complaint, defendant Walsh stated without qualification, "[w]e have completed our investigation and found that Daytree at Cortland Square is a responsible party." (ECF No. 1-1 at 11.) No other statement in defendant Walsh's letters suggested that whether there was an investigation and a finding was opinion, rather than fact. Further, defendant Walsh wrote this statement to insurance companies in a "notice" that defendants claim was a precursor to potential litigation—a context that the Court views as indicative of a letter containing factual statements. Even considering the statement to the insurers alone (and not to the DA's Office and the media), the Court disagrees with defendants that the notice falls in the "zone of protected opinion" because "[i]t is universally understood that such notifications of claims are going to be independently evaluated and investigated by the insurer."[11] (Defs. Reply at 9.) Defendants' reasoning would permit speakers in many settings to distance themselves from factual statements by retroactively invoking an audience's duty to

---

[10] Defendants note that "[n]o defamation claim is stated as against Defendants Senft or Cincale since neither is alleged to have made the defamatory statement." (Defs. Mem. at 9 n.3.) In light of the Court's conclusion that plaintiffs alleged multiple defamatory statements in connection with the alleged conspiracy, the Court rejects this argument.

[11] Defendants noted at oral argument that they sent this notice to plaintiffs' insurers, rather than their own. They argue that the insurers would therefore be especially likely to investigate and challenge defendants' claim. This argument does not change the Court's assessment that defendants' statement is factual in nature.

fact-check. For all of these reasons, the complaint plausibly alleges actionable statements of fact.[12]

### ii. Defamatory Statement

With regard to the defamatory nature of defendants' statements, the Court concludes that even what defendants assert is plaintiffs' single alleged statement—namely, that, after an investigation, plaintiffs were found to be responsible for toxic dumping in a public children's park—easily satisfies this pleading requirement.[13] In particular, the Court concludes that plaintiffs have plausibly alleged statements that "tend[ed] to expose [plaintiffs] to hatred, contempt or aversion, or to induce an evil or unsavory opinion of [them] in the minds of a substantial number of the community," and reflected on the conduct of their business. *Golub*, 89 N.Y.2d at 1076. The alleged public response, including calling plaintiffs "racists" and "pigs," provides additional evidence beyond the statement itself.

### iii. "Of and Concerning"

With respect to the question of whether defendants' statements were "of and concerning" all three plaintiffs, the Court concludes that plaintiffs have asserted facts that could plausibly satisfy this element for each of the plaintiffs.

Although the "of and concerning" requirement is generally an issue of fact, which the jury alone may decide, the Court properly may dismiss an action pursuant to Rule 12(b)(6) where the statements "are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff." Whether the complaint alleges facts sufficient to demonstrate a reasonable connection between the plaintiff and the alleged libel is thus a question for the Court.

*Church of Scientology Int'l*, 806 F. Supp. at 1160 (quoting *Handelman v. Hustler Magazine, Inc.*, 469 F. Supp. 1048, 1050 (S.D.N.Y. 1978)). "In determining whether the 'of and concerning' requirement has been sufficiently pleaded, the Court must consider whether those who know the plaintiff, upon reading the statements, would understand that the plaintiff was the target of the allegedly libelous statement." *Church of Scientology Int'l*, 806 F. Supp. at 1160; *see also Algarin*, 421 F.3d at 139 (affirming decision to dismiss complaint where it failed to "set forth circumstances from which to infer the identity of any particular officers who might be understood to have been the subject of any defamatory allegations in the Report"); *Dalbec*, 828 F.2d at 925 ("The test is whether 'the libel designates the plaintiff in such a way as to let those who knew [the

---

[12] The Court also notes that the statement regarding responsibility for the alleged dumping could itself provide a plausible basis for a defamation claim because it could be reasonably understood as being based upon undisclosed facts justifying the opinion. *See, e.g.*, *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 296 (S.D.N.Y. 2005) ("The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986))).

[13] Defendants argue that the statement was not defamatory because of the "exceedingly narrow context"—its purpose was to notify the insurers of the potential claim, and its audience was limited to those companies. As discussed *supra*, the Court rejects these arguments because plaintiffs have alleged multiple defamatory statements, including those to the media and DA's office. Considering all of these communications, the Court finds that plaintiffs have at this stage adequately alleged that defendants' statements were defamatory.

plaintiff] understand that [s]he was the person meant. It is not necessary that all the world should understand the libel.'" (citation omitted)).

Defendants argue that this element cannot be satisfied because the statement at issue named Daytree, but not the Datres, as a responsible party. Courts have allowed claims where the statement did not identify the plaintiff, but named an individual who was understood to represent that plaintiff. *See Dalbec*, 828 F.2d at 923, 925 (finding statement identifying plaintiff by her maiden name and address qualified as "of and concerning" plaintiff because the audience "need[ed] only believe that it was about her"). Courts have also allowed plaintiffs to bring defamation claims based on a statement made against a group, even where the individual plaintiff was not named. *Algarin*, 421 F.3d at 139; *see also DeBlasio v. N. Shore Univ. Hosp.*, 213 A.D.2d 584, 584 (1995) (finding plaintiff adequately alleged that a press release discussing improper treatment by hospital "personnel" was defamatory because plaintiff "was one of a handful of doctors [at the hospital] prescribing [this] treatment"). In such cases, courts will look to circumstances including the size of the group, and whether the statement refers to all or only some group members. *Algarin*, 421 F.3d at 140.

Here, notwithstanding the fact that the statement refers to Daytree only (and not to Mr. and Mrs. Datre), plaintiffs argue that readers would understand the statement to refer to all three plaintiffs because (1) the Datres were the only principals of Daytree, and "as the owners of such [a] closely-held corporation," their "personal reputations are inseparably intertwined," (2) "'Daytree' is a homophone for 'Datre,'" and (3) "[p]ublic response, as evidenced by the Internet comments . . . annexed to the Complaint, underscores that the corporation and

individual Plaintiffs received equal and distinctly separate harm." (Pls. Mem. at 9 n.6.)

Given the facts alleged in the complaint, and drawing all reasonable inferences in plaintiffs' favor for purposes of this motion to dismiss, the Court concludes that it is plausible that the allegedly defamatory statements are capable of supporting a jury's finding that such statements refer to plaintiffs. *See Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 174 (W.D.N.Y. 2003) ("[T]he court may grant a motion to dismiss a defamation claim where the challenged statements 'are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff.'" (quoting *Handelman*, 469 F. Supp. at 1050)).

iv. Litigation Privilege

Finally, defendants argue that the alleged defamatory statements, contained in letters issued to Daytree's insurers, are absolutely privileged as pertinent to litigation. As set forth below, the Court also declines to dismiss the claim at this stage because the Court cannot determine, based on the complaint, that these defamatory statements are protected by the litigation privilege.

First, plaintiffs allege that the statements in the letters to the insurance carriers were not "pre-litigation" in any respect. (*See* Pls. Mem. at 13 ("The letters, mailed to the insurance carriers and a broker and eventually given by Defendants to the press and District Attorneys' office, certainly served *no* pre-litigation function . . . . The statements were purely unsolicited third party communications intentionally designed to shift focus and blame away from the Defendants and onto the Datres." (footnote and citation omitted)).) Defendants, on the other hand, want the Court to take judicial notice of the fact that it is "common knowledge that such notice letters are a

compulsory component of insurance protocols and the litigation (of either the underlying claim or disputed coverage) that they so often precede."[14] (Defs. Mem. at 11.) However, the fact that notice letters are generally part of insurance protocols and potential litigation does not necessarily mean that such a letter (and the statements at issue here) was part of the pre-litigation process in this particular case. Given the allegations here and the ambiguity regarding the timing and scope of the letter, the Court believes that this issue is more appropriately addressed once discovery is complete. *See, e.g., Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, No. 11 Civ. 6353 CM, 2012 WL 2376466, at *14 (S.D.N.Y. June 20, 2012) ("To prove that its statements to eBay and to its former authorized dealers were 'part of' the instant judicial proceeding, Bel Canto will need to introduce factual material into the record that is not properly considered on a motion to dismiss.").

Similarly, even assuming *arguendo* that the letter falls within the pre-litigation privilege, dismissal in this case would still be unwarranted because only a qualified privilege applies to pre-litigation communications, *Front*, 24 N.Y.3d at 720, and plaintiffs have adequately alleged bad faith and malice to survive a motion to dismiss, *Albert*, 239 F.3d at 272. According to the complaint, defendant Walsh notified the insurers that defendants had completed an investigation and found plaintiffs to be responsible, even though he knew both statements to be false (he allegedly knew that the Town had not completed any such investigation, and had not determined that plaintiffs were responsible). (Compl. ¶ 122.)

It is further alleged that this was done with malice in order for defendants to deflect blame for the dumping onto plaintiffs because they were political opponents. (*Id.* ¶¶ 12-15, 114-22.) Thus, given these allegations, the issues of privilege defendants raised cannot be decided here at the motion to dismiss stage. *See, e.g., Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 155-56 (S.D.N.Y. 2016) (in denying motion to dismiss on grounds of self-defense and pre-litigation privileges, the court emphasized that "[p]laintiff has repeatedly pled that the January 3 and 4 Statement were made with malice and knowledge of their falsity . . . [and] has therefore pled sufficient facts to show a plausible defeat of any qualified privilege defense" (citations omitted)).

In sum, the motion to dismiss the defamation (libel) claim is denied.

C. Stigma-Plus Claim

In order to bring a Section 1983 due process claim on a so-called "stigma-plus" theory, a plaintiff must allege "a stigmatizing statement plus a deprivation of a tangible interest." *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (quoting *Algarin*, 421 F.3d at 138); *see also Paul v. Davis*, 424 U.S. 693, 701 (1976) (establishing that allegations of reputational harm alone are insufficient grounds for a federal constitutional tort). "To establish a 'stigma plus' claim, a plaintiff must show (1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" *Vega*, 596 F.3d at 81 (quoting

---

[14] Defendants argue that they sent these letters because the insurers' policies "might be called upon to satisfy damages" if toxic materials were found in the Park. (Defs. Mem. at 10.) Defendants claim that they sent these letters to "protect the Town's rights" by notifying the insurers of potential claims "as a

predicate to and in contemplation of litigation." (*Id.* at 11.) Defendants argue that the statements to Daytree's insurers were privileged because the insurers "could help in the resolution of the dispute." (*Id.* at 13.)

*Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)).

Even where these requirements have been met, "the availability of adequate process defeats a stigma-plus claim." *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006) (citing *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)). The Second Circuit has held that in cases "[w]here deprivation at the hands of a government actor [wa]s 'random and unauthorized,' hence rendering it impossible for the government to provide a pre-deprivation hearing, due process requires only a post-deprivation proceeding." *DiBlasio*, 344 F.3d at 302 (citations omitted) (providing as examples of random and unauthorized acts a case where a prisoner's mail was lost due to a prison employee's negligence, and a case where a prison guard destroyed an inmate's property). Otherwise, the general rule is that adequate process requires a *pre*-deprivation hearing.[15] *See DiBlasio*, 344 F.3d at 302 ("Generally, due process requires that a state afford persons 'some kind of hearing' prior to depriving them of a liberty or property interest.").

In support of their stigma-plus claim, plaintiffs allege that defendants' false statements were not merely defamatory and injurious to their business and reputations, but that defendants maliciously brought about a deprivation of their constitutional rights. Specifically, plaintiffs allege that—without providing any form of due process—defendants deprived them of their liberty interests, including their chosen occupations, and their property rights, including Daytree's tree-removal contract with the Town and Mr. Datre's paid position on the Town's Plumbers Examining Board. Further, plaintiffs allege that the Town's "top-ranking officials and final decision-makers" (naming defendants Senft, Cicale, Walsh,[16] and the councilmembers) carried out or approved the challenged actions (Compl. ¶ 209), thereby satisfying the "state-imposed" element of this claim and making the Town liable.

The Court concludes that plaintiffs have adequately alleged both elements required for a stigma-plus claim. First, for the same reasons discussed in relation to the state-law defamation claim, the Court finds that plaintiffs have adequately pled that defendants made "sufficiently derogatory [statements] to injure [their] reputation[s]." *Vega*, 596 F.3d at 81. Next, the Court concludes that plaintiffs have also properly pled the second portion of the test for a stigma-plus claim through their allegations of a "material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Id.* Plaintiffs' loss of their business through the termination of Daytree's contract and Mr. Datre's contract amounts to exactly this type of deprivation.[17] *See, e.g.,*

---

[15] For the purposes of this discussion, the Court references the required process as a "pre-deprivation hearing." The Court recognizes, however, that in some cases there could be other forms of adequate pre-deprivation process. *See, e.g., Adams v. Suozzi*, 517 F.3d 124, 127 (2d Cir. 2008) (finding the combination of pre-deprivation notice and grievance procedures under a collective bargaining agreement to be adequate process prior to deferral of plaintiffs' wages).

[16] Plaintiffs include the "Deputy Town Attorney" in this list, who they identified earlier as defendant Walsh.

[17] Had plaintiffs brought this claim based on only the deprivation of their rights to pursue their chosen occupation, defendants' motion would present a more difficult question. In *Valmonte v. Bane*, the Second Circuit explained,

> Our prior decisions indicate, as does *Paul v. Davis*, that defamation is simply not enough to support a cognizable liberty interest. It therefore follows that the deleterious effects which flow directly from a sullied reputation would normally also be insufficient. These would normally include the impact that defamation might have on job prospects, or, for that matter, romantic aspirations,

*Valmonte*, 18 F.3d at 1001 (describing "defamation in conjunction with termination of government employment" as "the clear situation that satisfies the 'stigma plus' test"); *Sacco v. Pataki*, 114 F. Supp. 2d 264, 271 (S.D.N.Y. 2000) (explaining that the "plus" requirement of a stigma-plus claim "has been met in most cases by dismissal from government employment").

Defendants argue that, even if plaintiffs adequately alleged a deprivation of their liberty and/or property interests, their stigma-plus claim fails because they did not pursue an Article 78 post-deprivation proceeding and, as discussed *supra*, "the availability of adequate process" defeats a stigma-plus claim. *Segal*, 459 F.3d at 213. The Court disagrees with defendants because, based on plaintiff's allegations, (1) the challenged governmental action was not "random and unauthorized," and (2) plaintiffs' compromised interests fall outside of the category for which the Second Circuit has found post-deprivation process to be sufficient.

First, the Court concludes that plaintiffs' allegations regarding defendants' scheme to blame them for toxic dumping, if true, would defeat any argument that defendants' defamatory statements and contract termination were "random and unauthorized" government action. Second, plaintiffs' liberty and property interests at issue fall within the category of interests that the Second Circuit has found requires a pre-

deprivation hearing. In *Segal*, the Second Circuit recognized that adequate process varies based on the interest at stake. 459 F.3d at 213-14 (describing "adequate process" as "the right to be heard 'at a meaningful time and in a meaningful manner'" (citation omitted)). In particular, the Court differentiated between at-will employment and other types of government contracts, concluding that, as *Segal* "involv[ed] an at-will government employee, the availability of an adequate, reasonably prompt, post-termination name-clearing hearing [wa]s sufficient to defeat a stigma-plus claim." *Id.* at 214; *see also Walsh v. Suffolk Cty. Police Dep't*, No. 06-CV-2237 (JFB)(ETB), 2008 WL 1991118, at *13-14 (E.D.N.Y. May 5, 2008), *aff'd*, 341 F. App'x 674 (2d Cir. 2009) (same). The Court clarified that its decision in *Segal* did not upset its holdings in *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005), and *DiBlasio*, in which it found that *pre*-deprivation hearings were required, because "neither [*Velez* nor *DiBlasio*] involved the sort of liberty interest presented by . . . an at-will employee." 459 F.3d at 217. *Velez* involved a plaintiff who "could 'only be removed by the Chancellor for cause' and enjoyed 'statutory restrictions [from] removal,'" *id.* (quoting *Velez*, 401 F.3d at 85-86), and *DiBlasio* involved a plaintiff who challenged the "summary suspension of his medical license," *id.* (citing *DiBlasio*, 344 F.3d at 294-95). The Court explained that these cases "presented interests that the government could deprive only through a showing of cause."[18] *Id.* Plaintiffs here seek

---

friendships, self-esteem, or any other typical consequence of a bad reputation.

18 F.3d 992, 1001 (2d Cir. 1994). Here, however, the Town's termination of the two contracts allegedly effected the equivalent of a loss of employment for all three plaintiffs (including Mrs. Datre, through her role as a principal of Daytree).

[18] In the Second Circuit's subsequent decisions in stigma-plus cases, it has since found Article 78 post-

deprivation proceedings to be adequate where the right at issue was at-will government employment, *see Gallagher v. N.Y.C. Health & Hosps. Corp.*, No. 17-2942-CV, 2018 WL 2049114, at *2 (2d Cir. May 2, 2018); *Guerra v. Jones*, No. 5:08-CV-0028 (NPM/GHL), 2010 WL 986403, at *10 (N.D.N.Y. Mar. 17, 2010), *aff'd*, 421 F. App'x 15 (2d Cir. 2011) ("Guerra had no property interest in his temporary position."); *Carter v. Incorporated Village of Ocean Beach*, 415 F. App'x 290, 293 (2d Cir. 2011);

to challenge the termination of their two-year tree-removal contract—an interest that their pleadings indicate the government could terminate only for cause.

The Court concludes that, in light of both the alleged nature of defendants' actions and plaintiffs' specific interests at stake, plaintiffs have plausibly asserted that they were entitled to a pre-deprivation hearing. The availability of an Article 78 post-deprivation proceeding, therefore, is clearly an inadequate substitute and does not defeat their stigma-plus claim with respect to at least the two-year tree-removal contract. The Second Circuit has also found this process to be inadequate where stigma-plus claims were based on actions other than terminations of government employment. *See DiBlasio*, 344 F.3d at 295, 302 (explaining that the district court erred in finding availability of post-deprivation process defeated plaintiff's stigma-plus claim, where the challenged government actions were defendant's allegedly defamatory statements in press releases). Accordingly, dismissal of the stigma-plus claim at the motion to dismiss stage is unwarranted.

### D. Breach of Contract Claim

In order to state a breach of contract claim, courts in this circuit have required plaintiffs to allege, "at a minimum, the terms of the contract, each element of the alleged breach and the resultant damages." *Kaplan v. Aspen Knolls Corp.*, 290 F. Supp. 2d 335, 337 (E.D.N.Y. 2003) (citation omitted). "The key elements of a breach of contract claim are: (1) the formation of an agreement via offer, acceptance and consideration; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages." *Id.*

Plaintiffs claim that the Town breached its tree-removal contract with Daytree by "fail[ing] to pay plaintiff [Daytree] for such services rendered." (Compl. ¶ 227.) According to the complaint, on or about December 13, 2012, the Town "adopted a formal resolution awarding a contract to plaintiff Daytree" for two years, under which Daytree "was to provide tree trimming, tree removal, and stump removal services" in exchange for payment at the contractual rates. (*Id.* ¶ 222.) Plaintiffs allege that both parties executed the contract, and that Daytree performed these services until the Town terminated the contract without cause on May 7, 2014. (*Id.* ¶ 223, 225-26.) Plaintiffs claim that defendants owe Daytree an amount equal to or exceeding $73,940 for the services Daytree performed under the contract, as well as an additional $1.6 million for the third-party services the parties contracted for Daytree to provide. (*Id.* ¶¶ 227-31.)

Defendants argue that plaintiffs failed to attach a copy of the contract to the complaint, or to allege the material terms of the contract. The Court disagrees, and finds that plaintiffs have adequately pled the necessary elements of their breach of contract claim. At this stage, plaintiffs were required to "disclose sufficient information to permit the defendant[s] 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.'" *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) (citation omitted). Plaintiffs were not required to attach a copy of the complaint. *See Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 666 (S.D.N.Y. 2007) (discussing plaintiff's failure to attach the contract *or* specify its terms and how defendant breached). Based on its review of the facts summarized above, the Court finds

---

*Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 121 (2d Cir. 2011), but has not stated that this process

would suffice in cases where the government employment was not at-will.

that plaintiffs satisfied their burden by alleging: (1) the elements of the contract formation (memorialized in the Town's formal resolution awarding the contract), (2) plaintiffs' performance of tree removal and other services, (3) the Town's breach by terminating the contract without cause and failing to pay plaintiffs, and (4) monetary damages.

The Court declines to accept defendants' request that it "take judicial notice of plaintiff Daytree's material breach" and grant the motion to dismiss this claim on this basis. (Defs. Mem. at 18.) Defendants argue that Daytree breached by failing to pay prevailing wages in connection with its performance of this contract, and assert that Daytree pleaded guilty to and was convicted of this offense. (*Id.*; Defs. Reply at 11.) Although courts will take judicial notice of facts such as that of a conviction, *see Vaughn v. Consumer Home Mortg. Co.*, 470 F. Supp. 2d 248, 256 n.8 (E.D.N.Y. 2007), *aff'd*, 297 F. App'x 23 (2d Cir. 2008), including at the motion to dismiss stage, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991), here, defendants ask the Court to do so to resolve a factual dispute. The Court will consider the parties' competing accounts of Daytree's alleged breach along with other defenses at a later stage, but at this time denies the motion to dismiss the breach of contract claim.

E. Conspiracy Claim

It is well established that a plausible Section 1983 conspiracy claim must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing

damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). Elaborating on that standard, the Second Circuit requires "more than 'conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights.'" *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997)).

As discussed at length *supra*, plaintiffs allege that defendants conspired to deflect blame for the dumping in the Park from themselves onto plaintiffs, in order to preserve their reputations and to further their political objectives (which plaintiffs allegedly hindered through their own political activities). Plaintiffs discuss the roles each of the individual defendants held in the Town's municipal government and/or the Conservative Party.[19] They discuss communications among the individual defendants, including specific meetings they had at which they "devised [their] scheme." (*See* Compl. ¶¶ 240, 247.) Plaintiffs also allege acts defendants carried out in furtherance of the alleged conspiracy, including conspiring to cause defendant Walsh to send the letters at issue to the insurers and to disseminate the accusations they contained to the media and DA's Office, and conspiring to cause the Town to terminate plaintiffs' contracts. Finally, plaintiffs allege damages resulting from the harms to their business and other injuries. Considering these pleadings, the Court finds that plaintiffs have adequately alleged an agreement among state actors to inflict an unconstitutional injury on plaintiffs (through

---

[19] In their roles as members of the Conservative Party, defendants were not state actors. Although some held positions in both, defendant Torres, at least, held no position within the Town government. Plaintiffs' claim, thus, does not run afoul of the intracorporate conspiracy doctrine, which provides "that the officers,

agents and employees of a single corporate or municipal entity, each acting within the scope of his employment, are legally incapable of conspiring together." *Henneberger v. County of Nassau*, 465 F. Supp. 2d 176, 196 (E.D.N.Y. 2006).

their loss of business), and acts committed in furtherance resulting in damages, to support a Section 1983 conspiracy claim. The motion to dismiss this claim is, therefore, denied.

F.  Liability of Specific Defendants

1.  Municipal Liability Claim

A municipal entity may be held liable under Section 1983 where the plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978) (emphasizing that the municipal policy must be the "moving force of the constitutional violation"). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, constitutional violations by government officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a 'custom or usage' with the force of law," and "thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870-71 (quoting *Monell*, 436 U.S. at 691).

Additionally, a single action can "provide[] a basis for municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). In order to be deemed a "policymaker" or "decisionmaker," an official must "possess[] final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). It is important to emphasize that a municipal entity may be held liable only where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *see also Segal*, 459

F.3d at 219 ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.").

Plaintiffs sued the Town, alleging that defendants' actions were "undertaken at the direction of, and with the consent of, the Town officials who . . . possessed . . . final decision-making authority at the Town." (Compl. ¶ 192.) Plaintiffs assert that the individual defendants, who participated in the conspiracy and "affirmatively authorized" defendant Walsh's actions, include final decision-makers of the Town, among them Town councilmembers, the Town Attorney, and the Deputy Town Attorney. (*Id.* ¶ 193.) Plaintiffs also note that defendant Walsh's letters were sent using Town letterhead, and argue that these letters constituted "formal policies and decisions of the Town." (*Id.* ¶ 194.)

In short, the Court concludes that plaintiffs have alleged sufficient facts to state a plausible claim for municipal liability under *Monell* in light of the actions allegedly taken by the Town's "authorized policymakers." *Amnesty Am.*, 361 F.3d at 126. Further, although courts have found a single action to be sufficient to establish municipal liability, *id.*, plaintiffs here have alleged multiple actions (including letters to numerous insurers, communications with the media and DA's office, and contract terminations). The Court, therefore, denies defendants' motion to dismiss with respect to the Town.

2.  Official Capacity Claims

With regard to the individual defendants sued in their official capacities, plaintiffs brought claims against councilmember defendants in their official capacities as agents of the Town. "[O]fficial-capacity

suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 283-84 (E.D.N.Y. 2010) (quoting *Monell*, 436 U.S. at 690 n.55); *see also Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) (noting that "a claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself"); *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010) ("The suit against the mayor and police chief in their official capacities is essentially a suit against the City of Schenectady, because in a suit against a public entity, naming officials of the public entity in their official capacities 'adds nothing to the suit.'" (citation omitted)). Accordingly, where a plaintiff brings claims against both a municipality and individuals in their official capacities as agents of that municipality, "courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources." *Castanza*, 700 F. Supp. 2d at 284 (quoting *Escobar v. City of New York*, No. 05-CV-3030-ENV-CLP, 2007 WL 1827414, at *3 (E.D.N.Y. June 25, 2007)).

Plaintiffs stated in their complaint that councilmember defendants Flotteron, Cochrane, and Weichbrodt were joined "in their official capacities as Councilmembers . . . only, and no claim[] for personal or individual liability is asserted against such defendants herein." (Compl. ¶ 199.) Councilmember defendants have moved to dismiss all claims brought against them in their official capacities. Because the Town is named as a defendant—and, as discussed *supra*, the claims against the Town survive this motion—the Court grants the motion to dismiss all claims as brought against the councilmember defendants.

### 3. Qualified Immunity

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). The Second Circuit has held that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)); *see also McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999).

The Court considers this motion with respect to the remaining individual defendants: Michael Walsh, Torres, Cicale, and Senft. Torres served as the Town Conservative Party Chairman, but did not hold a position within the Town government. Given that Torres was not a government actor, he cannot claim qualified immunity for his allegedly defamatory statements or his alleged participation in the conspiracy.

With respect to the other three individual defendants, they argue that they are entitled to qualified immunity in light of their objectively reasonable beliefs that their actions did not violate a constitutional right. Their primary defense is that the Town sent the letters to the insurers to protect the Town's interests, "in the objectively-reasonable exercise of governmental functions and duties." (Defs. Mem. at 22-23.) Defendants argue that it was objectively reasonable to identify Daytree as responsible "based on [the] Town's law enforcement photos and reports as the letters indicate." (*Id.* at 23.)

The Court concludes that the qualified immunity issue cannot be decided at the motion to dismiss stage given the allegations in the complaint. As discussed *supra*, plaintiffs allege that the individual defendants participated in disseminating knowingly false and defamatory statements, in bad faith, for the specific purpose of destroying their business and reputation, including by terminating their tree-removal contract with the Town. Moreover, the complaint alleges that, as part of this malicious plan, defendants falsely stated that an investigation had been conducted, and a finding of responsibility reached, even though they knew that neither of those things had taken place. In other words, according to the complaint, defendants wrote these false and defamatory letters and wrongfully terminated plaintiffs' contract in order to shift blame for the toxic dumping, with the intention of depriving plaintiffs—their political adversaries—of their liberty and property interests. If plaintiffs can prove all of these facts, no reasonable defendant would have understood his or her conduct to be lawful.

In sum, if the allegations in the complaint are true, there would be no basis for concluding that defendants held an objectively reasonable belief that their actions would not violate plaintiffs' constitutional rights. The Court, therefore, denies the remaining individual defendants' motion to dismiss based on qualified immunity. However, this issue may be raised again at the summary judgment stage.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss the claims for declaratory and injunctive relief and all claims against the councilmember defendants (Flotteron, Cochrane, and Weichbrodt), but denies the motion in all other respects.

SO ORDERED.



JOSEPH F. BIANCO
United States District Judge

Dated:    August 15, 2018
          Central Islip, NY

*** 

Plaintiffs are represented Andrew J. Campanelli and Amanda Rose Disken of Campanelli & Associates, P.C., 1757 Merrick Avenue, Suite 204, Merrick, New York 11566.

Defendants Michael Walsh, Anthony S. Senft, Jr., and Robert L. Cicale are represented Timothy F. Hill and Vincent J. Messina, Jr. of Sinnreich & Kosakoff LLP, 267 Carleton Avenue, Central Islip, New York 11722.

Defendant Michael Torres is represented by Joseph J Ferrante and William John Keahon of Keahon, Fleischer, Duncan & Ferrante, 1393 Veterans Memorial Highway, Suite 312 North, Hauppauge, New York 11788.

Defendants Town of Islip and councilmembers Steven J. Flotteron, John C. Cochrane, Jr., and Trish Bergin Weichbrodt are represented by John Ryan DiCioccio of the Islip Town Attorney's Office, 655 Main Street, Islip, New York 11751.